Thank you. Thank you, your honors. Lee Tucker for Anthony Jones. Good afternoon, and may it please the court. I will reserve two minutes for rebuttal. I will keep an eye on the clock. Okay, and we'll try to help. Thanks. So your honors, state authority alone cannot operate to extend federal police power beyond what Congress has authorized and allowed. There is no federal statute, regulation or appropriation that authorized these Border Patrol agents to enforce state traffic laws. As federal officers, these agents may only exercise the statutory authority granted by the federal government. And in the case of non-immigration offenses, which is what we have here, that power of arrest is limited to offenses against the United States committed in the presence of the officer or for any felony the officer has reasonable grounds to believe the person committed. Cross-certification under state law, even if it were valid, which of course Mr. Jones disputes, does not and cannot enlarge federal enforcement powers to permit Border Patrol agents to enforce the state laws anywhere and anytime when that enforcement is otherwise beyond their lawful federal mandate. Now the government, I believe, does not dispute that Congress has not authorized the expenditure of federal funds so that the Border Patrol can enforce state law. And in the report and recommendation in the district court, it was acknowledged that Border Patrol agents, like all federal agents, lack general police authority. Furthermore, in the district court, it was found that there was no immigration nexus here. The report and recommendation adopted by the district court found that this stop was not related to any interdiction of immigration offenses. It was not related to the surveillance the agents had been conducting when Mr. Jones drove by. Can I interrupt you for just a minute? I'm interested for the moment in the, I think it's called the constitutional question, assuming for the moment that the agents were cross-certified. I understand that's disputed, but assuming for the moment that they're cross-certified, you say nonetheless this was an invalid stop because these were federal agents doing state business and that they were paid for out of federal funds because they're federal agents and it's beyond what? It's beyond the spending power? That's the argument? Yes, your honor. That's one of our arguments, right? We argue both that this is unlawful under the fourth amendment and independently unlawful under the appropriation because it was a violation of the appropriations clause, which as discussed in most detail in the opening brief is very explicit that Congress has to authorize the spending of federal monies. And indeed, as we noted, there has been commentary and concern on this issue, both in a publication put out by the Heritage Foundation and by the Department of Justice itself. Assuming for a moment that you're right, that this is improper, meaning that the federal funds authorized were not authorized for this purpose and that even assuming appropriate sort of cross-certification, they weren't supposed to be doing this because the funds that were paying for their function didn't authorize this act. Does that give rise to a, I'll call it a private cause of action, but I guess more specifically here, does it give rise to a defense against the seizure? Yes, your honor, it does. Is it a cause? Do we have case law on the point? Well, it's interesting. There is that I could find no case law on this exact set of circumstances. However, there is case law establishing that an individual has standing to contest this unauthorized action. And also there is case law indicating that when an injury has occurred, suppression in a criminal case may be appropriate. And that latter part, I supplied the court with a analogy to this court's jurisprudence in the area of the Posse Comitatus Act, where it was found that a violation of that act did give rise to an individual being able to pursue suppression of evidence in a criminal matter. And in fact, in that case, the panel had held that suppression was appropriate. Sitting on bonk. I was about to point out what I think you're about to say, which is on bonk, we said that there can be suppression, but it wasn't appropriate in that context. So why, what is it about the circumstances of this? Assuming we agree with you that it was a violation of the appropriations clause and an excess of the spending power. What is it about these circumstances that would make suppression appropriate? Yes, Judge Miller, in Dreyer, where the court addressed the PCA case, that was a civilian agency that answered to the Navy. One of their staff had found evidence that a civilian was engaged in child porn offenses and had passed them on to someone else. Throughout court, the NCIS then realized, oh, that was a mistake, that shouldn't happen, and was taking steps already to ensure that it did not in the future. And so the reason the court on bonk said suppression is not appropriate here is because, of course, suppression is an extraordinary remedy. It is limited in its use to where it's needed for deterrence. And the court said it's not needed here. This matter was a one-off, it's being taken care of, and we don't need to impose the remedy of suppression to deter it from happening again. Here, in contrast, there has not been any acknowledgement or discussion from either the Border Patrol or the government in the course of this case and in the briefing to indicate a similar awareness of the problematic nature of federal agents enforcing state laws unrelated to their federal mission. That is why deterrence would be appropriate here. And why do you say it's unrelated to the federal mission? I mean, I grant that we look just specifically at the moment of the stop. The stop was for a violation of the state law, but the only reason they're following the defendant was because they suspected an immigration violation. They weren't just out enforcing state law. They didn't go out that morning and say, let's just go enforce some state laws. They were out there because they were investigating federal laws. So why isn't that enough? They were in the location because they were conducting surveillance on an area where there had been alien smuggling. But the district court found that they did not pursue Mr. Jones and initiate the stop because of immigration. It was not a stop supported by any suspicion that there were immigration offenses involved. He just happened to be driving by and they were staking out the park. So under the theory that that's enough to provide a nexus, really there would be no cabining of that. So on that theory, if it happened instead 10 minutes later when they had driven around the block to Dairy Queen to get coffee and someone drove by and honked and looked at them and drove around, they would still be free to give chase and pursue it. It's just, there's nothing to it. I'm not sure that that's right. Obviously, we've got a certain degree of probability, probable cause, reasonable suspicion. There's a certain level of suspicion that anybody has to have, any police officer has to have before they can conduct a stop. But if we're talking not about whether or not they have the ordinary justification for making a stop, assuming authority to make the stop, but instead what we're talking about is are they somehow within the broadly defined function of federal law enforcement, which is a different question. How close to the federal law enforcement function does this have to be? They were clearly staking it out for a federal law enforcement purpose. The SUV drives past them in an odd way. They pursue, it's possible that there was something going on related to the immigration function. The stop they made was justified, of course, not because of the immigration function, but it wasn't as though they were on an entirely independent frolic. As Judge Miller suggests, they just got up that morning and said, we're going to go enforce the traffic laws for the state of Arizona. Thank you very much. We'll be pleased to do that for you. Well, your honor, I would say this does approach a frolic. It wasn't something they woke up and said they would do, but as they were standing, as they were sitting there in this car drove by them, they in that moment took some umbrage at this driver honking at them and looking at them as he drove around and then gave chase. Agent Bullock, who is the agent found by the district court to be cross-certified, testified that he understood his power of enforcement to be for matters related to border crimes. But in no case did either agent testify that the impetus for their scrutiny was because they thought there were any federal, any nexus to any federal offense. And one thing I see I'm running out of time, but I did want to point out. Let me interrupt. We're on an interesting line of inquiry and we haven't even got to the cross-certification yet. So we'll just keep talking. Don't be nervous. Okay. Thank you. Regarding what initiated that pursuit, I did want to correct something in the opening brief that in the opening brief at page six, it says that the pursuit began after there had been an accelerated speed of about 40 miles per hour and he rolled through the stop sign. As I went back and looked at it, actually that's not correct. It appears if you look at page 72 of the excerpts of record and page five of the report and recommendation, which is page five of the excerpts, the rolling of the stop sign happened and then the acceleration. So it does appear that very little had occurred at the time these agents decided to pursue Mr. Jones. Yeah. It's a little bit like if you move quickly in front of a cat and you're smaller than the cat, the cat's going to do something. You move something, you move quickly or say something insulting to a law enforcement officer. They've just got these instincts, right? That happened. Can we talk about cross-certification? Yes. It looks as though the cross-certification of Bullock by Agent Hermanson did not comply with Arizona law. That is to say, he sent a letter saying we fulfilled all the requirements. But as I read Arizona law, he needs to send not only the letter, but he needs to send the underlying evidence, which he did not do. Is there any evidence that Hermanson thought he was sort of flouting state law? Or do we know, is this just the custom that Arizona had just decided they're going to cross-certify without having to look at all the paperwork? What do we know about this? That's an interesting question. I don't think the testimony does show whether it was a habitual carelessness or just in this instance. There was no testimony from Agent Hermanson to say we always, as I recall, to say, oh yeah, we always do it this way. He did acknowledge that these other aspects were not for this letter from Sheriff Napier saying, hey, these guys are cross-certified. Then that's essentially a meaningless requirement. Any sheriff, most sheriffs would be delighted to have the resources and personnel of the United States Border Patrol as part of their team. And if all it takes is to send a letter, there'd be nothing, if that's enough, there would be nothing to stop a sheriff from sending a letter, for example, to the head of the Tucson sector saying, hey, from this point forward, all your agents are crossing. But isn't that a problem for Arizona to solve? I mean, the requirement to provide this evidence is purely a creation of Arizona law. And if, you know, assuming we agree with your reading of the statute, which I think is, one can debate, you know, if Arizona sheriffs are certifying in cases where they shouldn't under law, then Arizona can deal with that. Why does it become a Fourth Amendment violation? Because the government is relying on that cross-certification to say that this action was valid. This action by these federal agents was valid. And if this court does not look at it, there will be no review on it. There's no state review to ascertain compliance. And there's no check to, so there would be, it would be really a meaningless requirement, if there's no way of verifying it. And if it all depends on one sheriff sending a letter for federal courts to say, okay, that's okay, this is authorized. The government has the burden to prove that the federal agents acted in accordance with the law. And I guess I have a follow up to that. I'm not aware that there's a constitutional standard for what cross-certification requirements have to be, right? Like those are just set by a state and they could have, they required what they required here. They could have required something different. The constitution doesn't really say anything about that. Right. So that goes back, I guess it goes back to Judge Miller's point of why isn't this the state's problem? I mean, they decided to put these requirements in place. They're going to make sure that they're followed or not. How has that translated into a constitutional problem? I'm sorry, Judge Hunsaker. I think I'm not explaining myself well. My response is it's a federal problem because these are federal agents using, for lack of a better word, the shield of this ostensible cross-certification to allege that their actions were authorized as federal agents. Okay. Well, let's stop here, here from the other side. We'll give you a chance to respond. Thank you. Afternoon, Your Honors. May it please the court, counsel. I'm Angela Woolridge appearing on behalf of the government in this case. Here, Your Honors, the proper inquiry is whether or not there was a violation because there was a stop, the traffic stop was reasonable. It was based on reasonable suspicion of numerous traffic offenses for which the agents had or at least had the reasonable belief that they had cross-certification to conduct the traffic stop, but also based on their general duties as law enforcement officers to protect the public, given the defendant's appropriate, and I would submit what we would expect of law enforcement officers, whether federal or otherwise, in protecting the community. And so the proper inquiry under the Fourth Amendment, not whether a state statute was complied with, clearly shows us that the district court did not err in adopting the report and recommendation and denying the motion to suppress. Here, Your Honors, we would submit that the clear error review does apply because while there may be issues, legal issues involved, as this court held in its private decision, when a inquiry is predominantly fact-based, the clear error standard applies. However, the government would also submit that under any standard, the district court correctly found that no Fourth Amendment violation occurred. And again, that is the appropriate inquiry. Can I interrupt for just a minute? This is on standard of review. I don't see that there's any seriously contested factual question. This strikes me as a case in which these are all legal questions. What's the factual question that turns this into clear error review? If we look at the appropriate inquiry, and that is whether a Fourth Amendment violation occurred, then that is a very fact-specific determination based on whether... What facts are at issue here? I don't think anybody's disputing anything. I do believe that there was some dispute. For instance, the defense disputed in the brief, the nature of the violations alleged that the agent somehow contributed to the violations or provoked the violations. There was some factual issue there. Provoked the traffic violation? Correct. But the difficult issues in this case have nothing to do with that. The difficult issues in this case, it seems to me, are entirely legal. You may still win, but I don't think it's clear error. I mean, I don't think that's the standard of review. And Your Honor, that is our position that under any standard of review, when applying the appropriate analysis, which again is the Fourth Amendment analysis, that the government does prevail, it should prevail, because the stop certainly was reasonable and supported by reasonable suspicion. I think that... As I say, that's not in dispute. Please, I don't think seriously in dispute. I can't be in dispute. There were clear traffic violations. Had they been ordinary police officers, this would have been easy. Sure. And not only whether or not we deem them ordinary police officers, they still are peace officers, and both agents testified unequivocally that it's their responsibility as peace officers to protect the public. And when they see someone commit... Let me ask you this, as distinct from their own sense of what their responsibilities were, were they properly cross-certified under Arizona law? Your Honor, I would submit that that may be a factual question. So, if we look at pages 58 through 60 of the excerpts, Agent Hermanson testified that before submitting the letter to the sheriff seeking the cross-certification, he ensured that every agent on that list had been trained, had undergone the proper training, and was currently certified and authorized as required by the Arizona state statute. But the question is whether or not Agent Hermanson had to provide the evidence of those things, not just the letter saying that it had been done. That's a legal question. And he did not supply any evidence. He only supplied his letter. And on that, was he in compliance with Arizona law or not? It's our position that it can be inferred for that letter, that he was avowing that these agents were, in fact... No, you're avoiding my question. I understand that that's what he's avowing. But as I'm tempted to read Arizona law, not only must there be a letter that says that this is true, he has to look at the... He has to submit the underlying evidence showing that it's true. He has to, you know, the training certificates and so on. Do you read the Arizona statute differently? How I read it, sir, Your Honor, I am not sure exactly what is required, because I don't know if there is any Arizona case law interpreting what that would be required. How about if you just read the statute? Just reading the statute, Your Honor, yes, it would suggest that perhaps some additional evidence would be required. But then we look to... Assume that that's true, then what? I mean, you may still win, but assuming that's true, then what? Let's assume that the cross-certification was invalid. Specifically, we have Agent Bullock, who was the agent that was specifically found by the magistrate judge and then the district court as possessing the cross-certification. He's also the driver of the vehicle who made that stop. He reasonably believed that he was cross-certified. His superior, his direct superior, who was Agent Hermanson, had told him that he was cross-certified. He didn't have any reason to doubt that, any reason to believe that that cross-certification was invalid. And I think that this court's decision in hearing is the most applicable here, because it applies that good faith exception, even when there is a mistake that's caused by another law enforcement officer of the same department. So let's say that Agent Hermanson failed to comply, and let's say his cross-certification was therefore deficient. That does not invalidate the good faith belief that Agent Bullock had. I understand that argument. It seems like a pretty good argument. The problem I have with it is Hermanson, who by terms of where we are right now, in terms of our assumption, Hermanson, who sought the certification, did not comply with the statutory requirements for certification, is participating in the stop. So if we had two officers, Bullock and Officer Bullock II, both of whom had been cross-certified pursuant to a letter from Hermanson, this would be a different case, because both of them would believe in good faith that they'd been properly cross-certified. However, we have Hermanson in the car, who didn't cross-certify properly. Now, maybe he thought he was doing it properly. That's a different form of good faith, but it's a step removed from, I'll take Officer Bullock, I don't know what the right word is, innocent, but I'll call him totally innocent. He thought in good faith. So again, assuming that the cross-certification is invalid, there is no evidence that Agent Hermanson knew it was invalid. In fact, he believed that it was. He testified that he believed that it was. That testimony was found to be credible. And at most, at most, the failure to provide that legal documentation, or I'm sorry, the failure to provide some evidence to the Sheriff's Department, at most could be considered negligent, but that isn't enough to require suppression. And so right there, and then that's not a systematic error that this extreme remedy of exclusion of evidence would be applied under this court and the Supreme Court's precedent. I would also point out that- I want to ask you about sort of an analogy. I mean, we have said in the warrant context that an officer who presents a facially deficient warrant, even if it's signed off on by a judge, doesn't get to rely on the good faith exception. Why wouldn't that reasoning translate to this context? I would submit that because, again, because this is not an issue of a concept of probable cause of a search warrant, but application of Arizona statute. And so we will say, so assuming that Agent Hermanson didn't apply with that statute, he misinterpreted. He didn't have reason. He didn't have any independent reason to believe that he had somehow insufficiently admitted this, submitted this, or any, there was no bad faith here that he was, that he was trying to perhaps get, get cross certification for a number of a mistake, not something that was so obvious, especially when you realize, when you consider that it was a state law that, that perhaps he wasn't as familiar with. But in any event, both agents testified that even if they didn't believe they had cross certification, they would have been required to make that stop in their duty to protect the public, because they felt that the defendant's driving behavior was such that it put the public at risk. The pedestrians, other motorists, in fact, Agent Bullock testified, he was aware, he was also concerned that the defendant would lose control of his vehicle and perhaps strike another residence in the area. This was a residential area. They, they all, both agents emphatically testified that the primary purpose of wanting to stop that vehicle was to protect the public. And if anything, that was certainly a reasonable belief that that was within the scope of their duties. So I would point out that in the rare instances that the exclusionary rule is applied in this context, that it is done to deter repeated police misconduct. Here, I don't think that there can be any argument that there is somehow misconduct when federal law enforcement officers who are in immigration offenses and perhaps narcotics offenses are in fact occurring, furthering the two primary purposes of the Border Patrol mission to protect the homeland, then see such egregious driving behavior that it not only violates state law that at least one of them has a good faith, reasonable belief to believe he can enforce, but also that they both unequivocally believe that it is part of their duty as law enforcement officers to protect the public, how that can in any stretch be considered misconduct. In fact, I think that's exactly what we would expect of any law enforcement officer, federal, state, local, or otherwise, that when they witness, you're, you're, you're, you're, you're now saying pretty much what you've said already. But if there are further questions from the bench, I'm quite willing to prolong this. You're over time, but if there are more questions from the bench, happy to have them. Okay. Thank you. No, we understand. We understand your position very well. Thank you. Now we took you over time. Let's put two minutes on the clock. Thank you, Your Honor. Excuse me. Thank you, Your Honor. Just to respond to some things that came up there, starting with the last point, the duty to protect the officer, the agents testified that when the car went by, they looked at each other and they said, Hmm, that's interesting. And then they started to pursue him so they could get the plate and run it. There was no indication from the Mr. Jones was engaged in dangerous behavior prior to the agents taking off after him. As to the point Judge Fletcher raised, I think that's very important about the fact that Agent Hermanson, who also participated in the stop, is the same agent who had submitted Agent Bullock's name. And it is not just that he was a supervisory agent. He's extremely high up in the Border Patrol. He was several levels above Agent Bullock. In fact, he was so high up that when I was preparing this case for argument with my colleagues, we were wondering how common it would even be for him to be in the field. He was a very high ranking agent and that power he would have over Agent Bullock combined with his authority as the person who submitted the request for cross certification is very significant. But I have to say that Hermanson testified that he was cross certified. We don't have in the records as far as they were able to tell what was in the material producing the cross certification. But Hermanson says I'm cross certified too, but because of something that was submitted by Shannon McCormick, not by me. Interestingly, he said he understood he was. He was not unequivocal about that. And also well, understanding is that's pretty quick. If I understand something, that means I understand it, right? OK, as to the government's point that maybe it was Mr. Hermanson thought he was complying with everything. I would refer the court to page eight of the excerpts of record, which is page eight of the R&R, in which it's clear that Mr. Hermanson did know the steps that should have been taken for proper cross certification. And then finally, just to wrap up, I appreciate the time, but I just want to go back to really what is the import of this case. And if this court were to accept the government's position, it would essentially be putting the courts imprimatur on a substantial expansion of federal police powers beyond that authorized by Congress, because it would allow Border Patrol enforcement of state laws, even without a clear link to their mission. Yeah, you've made that point. And at minimum, I think this court could decide it in the first instance, but at minimum, we should have a remand to the district court to address this important issue. OK, thank you. Thank you very much. Interesting case. Thank you both for good arguments. Casey, United States v. Jones, submitted. Thank you.
judges: W. Fletcher, Miller, Hunsaker